UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CARLTON J. BLEAU,                    :
               Petitioner,          :
                                     :
     v.                              :          CA 10-103 ML
                                     :
ASHBEL T. WALL, Director of          :
the Rhode Island Department          :
of Corrections,                      :
               Respondent.           :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

     Carlton J. Bleau ("Bleau" or "Petitioner"), *pro se,* filed
this Amended[1] Petition under 28 U.S.C. § 2254 for Writ of Habeas
Corpus by a Person in State Custody (Docket ("Dkt.") #6)
("Amended Petition").  The Attorney General of the State of Rhode
Island ("Attorney General"), designated a party-respondent, has
filed an amended motion to dismiss the Amended Petition.  See
State of Rhode Island's *Amended* Motion to Dismiss "Petition under
28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State
Custody" (Dkt. #11)[2] ("Amended Motion to Dismiss"); see also

---

[1] The Court identifies this document as an "Amended Petition" to differentiate it from Bleau's initial filing in this matter which was  docketed as a "Petition," see Docket ("Dkt."), even though it was actually a motion, see Motion for Order to File USC [sic] 28 USC § 2254 (Dkt. #1).

[2] In a single electronic filing on June 22, 2010, the State of Rhode Island filed three documents: (1) State of Rhode Island's Motion for Permission to File an *Amended* Motion to Dismiss "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody" ("State's Motion for Permission"), (2) State of Rhode Island's Memorandum in Support of Its Motion for Permission to File an *Amended* Motion to Dismiss "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody" ("State's Mem. Motion for Permission"), and (3) State of Rhode Island's *Amended* Motion to Dismiss "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody" ("Amended Motion to Dismiss").  As a result, both the State's Motion for Permission and the Amended Motion to Dismiss bear the designation

Order (Dkt. #7) (ordering Attorney General to file response to Petition). Bleau has filed multiple responses to the Amended Motion to Dismiss which are detailed in the Travel section of this Report and Recommendation. The Court treats them collectively as constituting an objection to the Amended Motion to Dismiss.

This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was held on August 18, 2010. For the reasons that follow, I recommend that the Amended Motion to Dismiss be granted.

## I. Facts

On November 26, 1993, Bleau was sentenced to a total term of fifty-five years of imprisonment after having been found guilty of first degree sexual assault, second degree sexual assault, and malicious destruction of property. See State v. Bleau, 668 A.2d 642, 643 (R.I. 1995) ("Bleau I"); see also Transcript ("Tr."), Volume ("Vol.") III at 508. The facts giving rise to Bleau's convictions, as stated by the Rhode Island Supreme Court, are set forth below:

> On January 13, 1988, at approximately 11:30 p.m., Barbara Lindquist (Lindquist) went to a neighborhood bar in Central Falls, Rhode Island, hoping to find her sister. After discovering that her sister was not there, Lindquist ordered a drink and sat and talked with the bartender, Elaine Beaudette, an acquaintance of her sister's. Over the next couple of hours, Lindquist had two or three more drinks and played pool with a group of people that included defendant and friends of Lindquist's sister. At approximately 1:45 a.m., the entire group

---

"Dkt. #11." To avoid this confusing circumstance, the State should have re-filed the Amended Motion to Dismiss after the Court granted the State's Motion for Permission. Nevertheless, because even a document number which is a duplicate is of some assistance in locating and identifying a particular filing, the Court includes the "Dkt. #11" denomination in its initial identification of both the State's Motion for Permission and the Amended Motion to Dismiss.

departed and, after talking in the parking lot, went their separate ways.

At trial, Lindquist testified that, at some point in the evening, defendant had persuaded her to give him a ride to his home. Thus, when the group dispersed, she and defendant drove off together in her car. She further testified that she had driven, at defendant's direction, up and down a series of side streets for approximately twenty minutes when he instructed her to pull into the parking lot of an industrial park. Lindquist testified that once in the parking lot, defendant struck her, sexually assaulted her, took her purse, and after ordering her to remain in the car, punctured all four tires on the automobile and then fled.

At approximately 3:45 a.m., the police discovered Lindquist wandering down the street, screaming and crying, her face swollen, her lip cut, her jeans and underwear torn and hanging from her body. She said she had just been raped. The police found Lindquist's car almost a block away with four flat tires, all with punctures.

On January 18, 1988, the police showed Lindquist an array of five photographs of middle-aged white men wearing glasses, from which array she identified defendant. The defendant was arrested the following day and was later released on bail. An indictment was filed on May 24, 1988, charging defendant with three counts of first-degree sexual assault, one count of robbery, and one count of malicious destruction of property. The defendant failed to appear at his scheduled arraignment on June 15, 1988, and a warrant for his arrest was issued. On July 28, 1988, defendant was arrested in Bangor, Maine, and was returned to Rhode Island, where he was arraigned on August 11, 1988, and again released on bail on August 22, 1988.

Meanwhile, defendant had also been charged with assault with a dangerous weapon and leaving the scene of an accident resulting in a personal injury in a separate incident on January 11, 1988. On October 31, 1989, defendant not only failed to appear for a status conference on the charges in the instant case but also failed to appear for trial on the assault-with-a-dangerous-weapon and leaving-the-scene charges, resulting once again in the issuance of a warrant for his arrest.

The defendant, who had again left the state, was arrested and returned to Rhode Island in July 1992. On July 15, 1992, defendant admitted to and was declared to be a violator of the conditions of his release and was remanded to the Adult Correctional Institutions.

The trial on the assault-with-a-dangerous-weapon and leaving-the-scene charges began on January 6, 1993, and ended two days later with acquittal of the assault and conviction of leaving the scene. On February 3, 1993, a motion for a new trial was denied, and on March 17, 1993, defendant was sentenced to serve seven months of a two-year sentence, with seventeen months suspended.

A jury trial in the instant case was held during seven days in July 1993. The defendant was found guilty of two charges of first-degree sexual assault, guilty of a reduced charge of second-degree sexual assault, and guilty of malicious destruction of property. On September 10, 1993, defendant's motion for a new trial was denied, and following his sentencing on November 26, 1993, defendant filed this appeal, pursuant to G.L.1956 (1985 Reenactment) § 9-24-32.

Bleau I, 668 A.2d 642, 643-44 (R.I. 1995).

## II. Travel

### A. State Court

The Rhode Island Supreme Court denied Bleau's direct appeal on December 22, 1995. Id. at 646. In 2002, a justice of the Rhode Island Superior Court granted an application for post-conviction relief based on newly discovered evidence. See Bleau v. Wall, 808 A.2d 637, 640 (R.I. 2002) ("Bleau II"). The new evidence concerned testimony about hair and fibers which had been given at Bleau's trial by Agent Michael Malone ("Malone"), a senior examiner from the Hair and Fibers Unit of the FBI laboratory. See id. Malone had testified that the hairs from the victim's clothing and vehicle "completely matched" the samples from Bleau's head. See id. In 1997, the United States Inspector General issued a report detailing the results of an investigation into questionable FBI laboratory practices. See

4

id. The report prompted the FBI to employ forensic scientists to review cases involving the work and testimony of examiners who were suspected of giving false or inaccurate testimony in criminal cases. See id. at 641. Malone's files and testimony were among those examined, and a copy of the resulting report was forwarded to the Rhode Island Department of the Attorney General. See id. The report, authored by Steve Robertson ("Robertson"), indicated that there was insufficient documentation to determine whether Malone had conducted the tests in a scientifically acceptable manner. See id. However, Robertson concluded that "Malone's testimony differed dramatically from the laboratory report and that his testimony about the blue and white fibers from [the victim]'s clothing was misleading and overstated." Id. Robertson also noted that Malone testified that he examined certain items, whereas the notes indicated that a technician conducted the examination. See id. In addition, Robertson stated that Malone had testified incorrectly about the ability of the microspectral monitor when he stated that it could be used to identify a specific dye. See id. Robertson's report did, however, note that a second examiner confirmed Malone's findings concerning the microscopic match of the hair samples, and Robertson did not dispute those findings.

The post-conviction relief judge granted the application without an evidentiary hearing based on Robertson's report, concluding that there was no factual dispute and that "if [the] information regarding * * * Malone's outrageous misconduct were available to defense counsel at the time of trial and were placed before a jury, [he] simply could not fathom a jury rendering a verdict of guilty." Id. (alterations in original). The state supreme court reversed, finding that the post-conviction relief judge had abused his discretion in failing to hold an evidentiary hearing. Id. at 642. The court noted that the newly discovered

5

evidence lacked materiality as "it merely confirmed [Bleau's] presence at the scene[,] a fact which never was in dispute." <u>Id.</u> at 643. In addition, the court also found that the newly discovered evidence was cumulative, immaterial, and impeaching and that it did not justify the order granting post-conviction relief.[3] <u>Id.</u> at 644.

In June of 2004 Bleau filed a second application for post-conviction relief. <u>See</u> <u>Bleau v. State</u>, 968 A.2d 276, 278 (R.I. 2009) ("<u>Bleau III</u>"). In this second application, Bleau argued that his conviction should be reversed because: (1) he was denied a speedy trial; (2) he was denied a fair trial because the trial justice refused to appoint a new attorney to represent him; and (3) he was denied effective assistance of counsel. <u>See</u> <u>id.</u> A hearing on Bleau's second application for post-conviction relief was held on March 24, 2005. <u>See</u> <u>id.</u> The hearing justice denied the application in open court, and Bleau appealed the denial to the Rhode Island Supreme Court. <u>See</u> <u>id.</u> That court affirmed the denial in an order issued on April 21, 2009. <u>See</u> <u>id.</u>

**B. Federal Court**

---

[3] Although the Rhode Island Supreme Court reversed the judgment of the superior court which had granted Bleau's application for post- conviction relief, <u>see</u> <u>Bleau II</u>, 808 A.2d at 644-45, thereby reinstating the sentence which he had received in 1993, it appears that Bleau was subsequently re-sentenced in 2003, apparently at the request of the Adult Correctional Institutions ("ACI"), <u>see</u> Memorandum in Support of Petitioner's Challenge to the State of Rhode Island's Motion to Dismiss Petitioner's 28 U.S.C. § 2254 Application as Time Barred (Dkt. #19) ("Bleau's Post-Hearing Mem."), Attachment ("Att.") 1 (miscellaneous documents) at 2-5 (transcript of 12/18/03 superior court proceeding referencing "reinstate[ment of] sentence"); <u>id.</u> at 6-7 (Judgement of Conviction and Commitment signed by Associate Justice Susan E. McGuirl); <u>id.,</u> Att. 2 (Letter from Bleau to Barletta of 9/17/10) at 1 (referring to "my resentencing by Justice Susan E. McGuirl). This procedural anomaly does not affect the Court's resolution of the instant Amended Motion to Dismiss.

Bleau commenced this action by filing a petition[4] and a motion to compel and to appoint counsel[5] on March 5, 2010. See Dkt. The motion contained a twofold request for relief. See Order Denying Motion to Compel and to Appoint Counsel ("Order of 3/24/10") at 3. It sought to have the Court order Defendant A.T. Wall ("Wall") to send Bleau's "'Legal Paperwork to this Honorable Court' by certified mail," id., and also requested the appointment of counsel, see id. The Court denied the motion to the extent that it sought an order directed against Wall "because there is no requirement that a § 2254 Petition be sent by certified mail and Petitioner's other filings appear[ed] to have reached the Court without difficulty." Id. To the extent that the motion sought appointment of counsel, it was denied without prejudice to being renewed after Petitioner had filed his § 2254 Petition. See id.

On May 20, 2010, Bleau filed his Amended Petition (Dkt. #6), and on the same date the Court ordered the Attorney General to respond to the filing, see Order (Dkt. #7). A response was filed on June 2, 2010, in the form of a motion to dismiss. See State of Rhode Island's Motion to Dismiss "Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody" (Dkt. #8) ("First Motion to Dismiss"). On June 9, 2010, Bleau filed an objection to the First Motion to Dismiss. See Reply Brief to State's Brief (Dkt. #9) ("Objection to First Motion to

---

[4] To be precise, the petition was not an actual petition but a Motion for Order to File USC [sic] USC § 2254 (Dkt.#1). See n.1. However, this motion was docketed as a "Petition," see Dkt. #1, and it commenced the action. Bleau's actual petition was received on May 20, 2010, see Amended Petition (Dkt. #6), and it was docketed as an "Amended Petition." The Court refers to it as such even though, strictly speaking, there was no prior "Petition."

[5] The motion to compel and to appoint counsel was untitled. The Court identified it as such. See Order Denying Motion to Compel and to Appoint Counsel (Dkt. #3) ("Order of 3/24/10").

Dismiss").

The Court scheduled a telephonic hearing on the Motion to
Dismiss for June 30, 2010. <u>See</u> Dkt. After receiving notice of
the hearing, Bleau wrote to Chief Judge Mary M. Lisi, stating
that a telephonic hearing would be problematic for him because he
had "a very bad hearing problem," Letter from Bleau to Lisi,
C.J., of 6/16/10 (Dkt. #10) at 1, and asking for the appointment
of counsel "at least," <u>id.</u> at 2, for the hearing, <u>see</u> <u>id.</u> On
June 22, 2010, the State filed a motion for permission to file an
amended motion to dismiss. <u>See</u> State of Rhode Island's Motion
for Permission to File an *Amended* Motion to Dismiss "Petition
under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in
State Custody" (Dkt. #11)[6] ("State's Motion for Permission"). As
a result of these developments, the Court rescheduled the June
30th hearing to August 18, 2010, <u>see</u> Order Rescheduling Hearing on
Motion to Dismiss (Dkt. #13) ("Order of 6/25/10") at 1, and
ordered that Bleau be brought to the courthouse for the hearing,
<u>see</u> <u>id.</u> at 2. Bleau was given until July 9, 2010, to file an
objection to the State's Motion for Permission.[7] <u>See</u> <u>id.</u> at 1.
The Order of 6/25/10 further stated that if the State's Motion
for Permission was granted, Bleau would have until August 6,
2010, to file a response to the amended motion to dismiss, and
the amended motion to dismiss would be heard on August 18, 2010,
<u>see</u> <u>id.</u> at 1 n.1. In a separate order, the Court denied the
request for the appointment of counsel which was contained in
Bleau's June 16, 2010, letter to Judge Lisi.[8] <u>See</u> Order Denying

---

[6] <u>See</u> n.2.

[7] In the June 25, 2010, order the State's Motion for Permission is referred to as the
"Motion for Leave." Order Rescheduling Hearing on Motion to Dismiss (Dkt. #13) at 1.

[8] The Order Denying Motion to Appoint Counsel explained the reason for the denial.

Motion to Appoint Counsel (Dkt. #14).

Bleau did not file an objection to the Motion for Permission within the time allowed by the Order of 6/25/10, and the Court granted that motion on July 26, 2010.  See Dkt.  More than three weeks after the July 9, 2010, deadline for filing an objection to the Motion for Permission, Bleau filed a memorandum in which he requested that the State's First Motion to Dismiss be ruled on and denied.[9]  See Petitioner's Memorandum in support of

---

On March 24, 2010, the Court denied Petitioner's request for the appointment of counsel without prejudice to being renewed after he had filed his § 2254 Petition.  See Order Denying Motion to Compel and to Appoint Counsel (Docket ("Dkt.") #3) ("Order of 3/24/10") at 3.  Petitioner filed what was docketed as Amended Petition for Writ of Habeas Corpus (Dkt. #6) on May 20, 2010.  As a result of this filing, Petitioner's renewed request for the appointment of counsel is permissible under the Court's Order of 3/24/10.  Petitioner, however, also filed a motion for the appointment of counsel in an essentially identical action, Carlton Bleau v. State of Rhode Island, CA 10-156 S, and that motion was denied in a Memorandum and Order issued on April 6, 2010, by Senior Magistrate Judge Jacob Hagopian.  See Carlton Bleau v. State of Rhode Island, CA 10-156 S, Memorandum and Order (Dkt. #7) ("Memorandum and Order of 4/6/10").  The denial was not without prejudice, and the Court views the Memorandum and Order of 4/6/10 as being dispositive on the issue of whether counsel should be appointed for Petitioner.  Granting the renewed motion for the appointment of counsel in this case would, in practical terms, overrule the determination made by Senior Magistrate Judge Hagopian that counsel should not be appointed.  This Magistrate Judge lacks authority to overrule a determination made by another magistrate judge of this Court.

Order Denying Motion to Appoint Counsel (Dkt. #14) at 1-2.  In a footnote which appears immediately following the above paragraph the Court noted that "[r]ulings made by a magistrate judge are appealed to the district judge to whom the case is assigned."  Id. at 2 n.1.

[9] The basis for the State's First Motion to Dismiss was that Bleau's petition was time-barred.  See State of Rhode Island's Memorandum in Support of Its Motion to Dismiss "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody" ("State's Mem. First Motion to Dismiss") at 5.  Bleau responded to this contention by stating that he had filed a motion for a sentence reduction on March 5, 1996, and that the pendency of a motion to reduce sentence tolled the one year limitations period of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214.  See Reply Brief to State's Brief (Dkt. #9) ("Objection to First Motion to Dismiss") at 2 (citing Kholi v. Wall, 582 F.3d 147, 149 (1st Cir. 2009)).  In moving to file an Amended Motion to Dismiss, the State

his Objection to the State of Rhode Island's Motion to Dismiss "Petition Under 28 U.S.C. § 2254 for writ of Habeas Corpus by a person in State Custody"[10] (Dkt. #15) ("Bleau's Mem. Motion to Dismiss").  Given that Bleau failed to file a timely objection to the State's Motion for Permission and that the Court had already granted that motion, the Court viewed Bleau's request as untimely and declined to grant it.[11]

On August 18, 2010, the Court conducted a hearing on the Amended Motion to Dismiss.  At the hearing, Bleau submitted two documents, each with attachments.  The documents were docketed as Dkt. #16[12] and Dkt. #17.[13]  Following the hearing the Amended

---

appeared to acknowledge that Bleau had filed a motion to reduce sentence within 120 days of the denial of his direct appeal.  <u>See</u> State of Rhode Island's Memorandum in Support of Its Motion for Permission to File an *Amended* Motion to Dismiss "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody" ("State's Mem. Motion for Permission") at 2 ("Given that the State, in the below 2009 proceeding, apparently acknowledged Petitioner's submission of a March 1996 motion for sentence-reduction, the State would – until such time as the Supreme Court of the United States passes upon <u>Kholi</u> – withdraw its previously asserted time-bar predicated dismissal motion ....").

[10] The Court identifies Bleau's memorandum by its title without adding capitalization, but adding closed quotation marks and inserting spaces where needed.  <u>See</u> Petitioner's Memorandum in support of his Objection to the State of Rhode Island's Motion to Dismiss "Petition Under 28 U.S.C. § 2254 for writ of habeas Corpus by a person in State Custody" (Dkt. #15) ("Bleau's Mem. Motion to Dismiss").

[11] For purposes of formalizing the Court's action relative to the request contained in Bleau's Mem. Motion to Dismiss, the Court is issuing an order with this Report and Recommendation denying the request.  <u>See</u> Order Denying Petitioner's Request that Court Rule on State's First Motion to Dismiss (Dkt. #20).

[12] Dkt. #16 is a two page memorandum entitled "Ineffective Assistance of Counsel[,] Attorney Jack Barense."  Attached to the memorandum is a copy of the Rhode Island Supreme Court opinion in <u>Lerner v. Moran</u>, 542 A.2d 1089 (R.I. 1988).

[13] Dkt. #17 is a two page memorandum entitled "Argument Issue – Conflict of Interest[,] Attorney Robert Craven, – As Assistant Attorney General, He also was Appointed for the

Motion to Dismiss was taken under advisement.

On August 25, 2010, Bleau sent a three page letter addressed to a deputy clerk of this Court. <u>See</u> Letter from Bleau to Barletta of 8/25/10 (Dkt. #18). In the letter, Bleau stated that he wanted to bring to the attention of this Magistrate Judge a letter which he had written after being found guilty of the charges but before he was sentenced. <u>See id.</u> at 1. Bleau described the contents of the earlier letter. <u>See id.</u> He also enclosed a copy of parts of a letter which he stated that he had written to Attorney Robert Craven for the post-conviction relief hearings held in the superior court on December 13 and 14, 2001, <u>see id.</u>, Attachment ("Att.") at 1-2, and two pages of handwritten instructions which appeared to be directed to his trial attorney, <u>see id.</u> at 3-4. On September 22, 2010, Bleau filed a post-hearing memorandum without first obtaining permission from the Court.[14] <u>See</u> Memorandum in Support of Petitioner's Challenge to the State of Rhode Island's Motion to Dismiss Petitioner's 28 U.S.C. § 2254 Application as Time Barred (Dkt. #19) ("Bleau's Post-Hearing Mem.").

### III. Habeas Corpus Law

The applicable standard for this Court to consider claims asserted in a state prisoner's § 2254 petition is set forth in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"). <u>See</u> <u>Rashad v.</u>

---

Petitioner's Post–Conviction [Relief]." This document has two attachments. The first attachment consists of the three page State's Answer to Defendant's Motion for Discovery and Inspection and the one page State's Answer to Defendant's Motion for Legible Copies. The second attachment is a letter from Attorney Robert E. Craven to Bleau dated July 29, 1998.

[14] Bleau's filing of additional memoranda without permission violates this Court's Local Rules. <u>See</u> District of Rhode Island Local Rule ("DRI LR") Cv 7(b)(3) ("No memorandum other than a memorandum in support of a motion, a memorandum in opposition, and a reply memorandum may be filed without prior leave of the Court."). In deference to his *pro se* status, the Court has, nevertheless, considered the memoranda.

<u>Walsh</u>, 300 F.3d 27, 30 (1st Cir. 2002)(noting that where "under-
lying case involves a state prisoner's attempt to secure a writ
of habeas corpus, our task proceeds under the deferential
standard of review mandated by the [AEDPA]").  The AEDPA
significantly limits the scope of federal habeas review.  <u>See</u>
<u>Bell v. Cone</u>, 535 U.S. 685, 693, 122 S.Ct. 1843 (2002)
(explaining that the AEDPA "modified a federal habeas court's
role in reviewing state prisoner applications in order to prevent
federal habeas 'retrials' and to ensure that state-court
convictions are given effect to the extent possible under law");
<u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S.Ct. 1495 (2000)("In
sum, [28 U.S.C.] § 2254(d)(1) places a new constraint on the
power of a federal habeas court to grant a state prisoner's
application for a writ of habeas corpus with respect to claims
adjudicated on the merits in state court."); <u>Sanna v. Dipaolo</u>,
265 F.3d 1, 15 (1st Cir. 2001)("The parameters for granting habeas
relief historically have been quite narrow, and the AEDPA
standard of review circumscribed those parameters even
further.").  Under <u>Rashad v. Walsh</u>, 300 F.3d at 34-35, the writ
may not be granted unless the state court's adjudication of the
claim:

> (1) resulted in a decision that was **contrary to**, or
> involved an **unreasonable application of**, clearly
> established Federal law, as determined by the Supreme
> Court of the United States;  or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(bold added); <u>see also</u> <u>Rashad v. Walsh</u>, 300
F.3d at 34 (stating that a federal court may grant habeas relief
for a state prisoner only if the state court proceeding falls
within the parameters of either subsection).

The "contrary to" and "unreasonable application" clauses of

§ 2254(d)(1) have independent meaning.  <u>See</u> <u>Bell v. Cone</u>, 535
U.S. at 694; <u>Williams v. Taylor</u>, 529 U.S. at 404-05.  "[A] state
court decision is considered contrary to Supreme Court precedent
only if it either applies a test that is inconsistent with one
announced by the Court or reaches the opposite conclusion on
materially indistinguishable facts."  <u>Rashad v. Walsh</u>, 300 F.3d
at 34-35 (citing <u>Williams v. Taylor</u>, 529 U.S. at 405-06).  The
"unreasonable application" clause affords relief to a state
prisoner "if the state court applies the correct legal standard
in an objectively unreasonable manner, unreasonably extends a
Supreme Court precedent to an inappropriate context, or fails to
extend such a precedent to an appropriate context."  <u>Id.</u> at 35
(citing <u>Williams v. Taylor</u>, 529 U.S. at 407-08).  In deciding
whether a state court decision fits within the scope of this
second clause, a federal court evaluates "the strength of the
state court's ultimate conclusion, rather than its announced
rationale ...."  <u>Id.</u> (citing <u>Ouber v. Guarino</u>, 293 F.3d 19, 34
(1st Cir. 2002)).  "Importantly, the test does not demand
infallibility: a state court's decision may be objectively
reasonable even if the federal habeas court, exercising its
independent judgment, would have reached a different conclusion."
<u>Id.</u> (citing <u>Williams v. Taylor</u>, 529 U.S. at 411; <u>Williams v.
Matesanz</u>, 230 F.3d 421, 425 (1st Cir. 2000)).  It is not enough
that the federal habeas court "concludes in its independent
judgment that the relevant state-court decision applied clearly
established federal law erroneously or incorrectly.  Rather, that
application must also be unreasonable."  <u>Williams v. Taylor</u>, 529
U.S. at 411; <u>accord</u> <u>Horton v. Allen</u>, 370 F.3d 75, 80 (1st Cir.
2004)("To be an unreasonable application of governing law, the
state court's determination must not only be incorrect but also
be objectively unreasonable.")(citing <u>Williams</u>); <u>McCambridge v.
Hall</u>, 303 F.3d 24, 36 (1st Cir. 2002)(same); <u>see also</u> <u>O'Laughlin</u>

13

v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009)("some increment of incorrectness beyond error is required").  The Court's focus "is not how well reasoned the state court decision is, but whether the outcome is reasonable."  Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001).

The determination of whether the state court decision in question passes this test "must be decided primarily on the basis of Supreme Court holdings that were clearly established at the time of the state court proceedings."  Rashad v. Walsh, 300 F.3d at 35 (citing Williams v. Taylor, 529 U.S. at 412).  Nevertheless, cases from lower federal courts which are factually similar "may inform such a determination, providing a valuable reference point when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns."  Id. (citing Ouber v. Guarino, 293 F.3d at 26; O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998)).

The AEDPA also permits relief from a state court judgment if that judgment is based on an unreasonable determination of the facts.  See id. (citing 28 U.S.C. § 2254(d)(2)); see also Sivo v. Wall, No. CIV.A. 08-245-S, 2010, WL 2636024, at *7 (D.R.I. June 29, 2010)("Although what constitutes an 'unreasonable determination of the facts' may be difficult to define, 'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'")(quoting Wood v. Allen, ___ U.S. ___, 130 S.Ct. 841, 849 (2010)).  "The state court's factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence to the contrary."  Id. (quoting Ouber v. Guarino, 293 F.3d at 27); see also Sanna v. Dipaolo, 265 F.3d at 7 (stating that the standard applies only to the determination of "basic, primary, or historical facts").  Thus, the petitioner's burden in this regard is "heavy," Rashad

v. Walsh, 300 F.3d at 35, and if he fails to carry it "a federal habeas court must credit the state court's findings of fact—and that remains true when those findings are made by a state appellate court as well as when they are made by a state trial court," id. (citing King v. Bowersox, 291 F.3d 539, 540 (8th Cir. 2002); Everett v. Beard, 290 F.3d 500, 507 (3rd Cir. 2002)).

**IV. Discussion**

    **A. Grounds for Relief**

    Bleau alleges five grounds for relief in his Amended Petition. See Amended Petition at 6-11. First, he claims that he was denied a speedy trial. See id. at 6. Second, he contends that he was denied a fair trial by being compelled to proceed to trial with an attorney in whom he had no confidence. See id. at 8. Third, Bleau alleges that he received ineffective assistance of counsel. See id. at 9. Fourth, he complains of judicial misconduct. See id. at 11. Fifth, he also complains of prosecutorial misconduct. See id. at 11-2.[15] The Court discusses these claims below. The first two claims were addressed by the Rhode Island Supreme Court in its consideration of Bleau's direct appeal. See Bleau I, 668 A.2d at 644-46. His claim of ineffective assistance of counsel was considered, at least in part, in Bleau III, 968 A.2d at 278-79. His claims of judicial misconduct and prosecutorial misconduct have not been addressed by the state supreme court.

    **1. Speedy Trial**

        **a. Consideration by State Court**

    The Rhode Island Supreme Court's consideration of this issue is reproduced below:

---

[15] Bleau appears to have inserted a page into his Amended Petition between pages 11 and 12. The inserted page, numbered "Page 11-2," contains the fifth ground for relief of "Prosecutorial Misconduct."

On appeal defendant contended that he had been denied his right to a speedy trial, as guaranteed by both the United States and the Rhode Island Constitutions. U.S. Const. Amend. VI; R.I. Const. art. 1, sec. 10. In Tate v. Howard, 110 R.I. 641, 647-48, 296 A.2d 19, 23-24 (1972), this Court adopted the test set forth by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in assessing whether a criminal defendant's right to a speedy trial has been violated. The Barker analysis entails the consideration of four factors: (1) the length of time before trial, (2) the reasons for the delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant. 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. This Court has stated that the determination of whether a constitutional violation has occurred "requires the weighing of each factor, with no single one being wholly dispositive." State v. DeAngelis, 658 A.2d 7, 11 (R.I. 1995) (citing State v. Powers, 643 A.2d 827, 830-31 (R.I. 1994)).

The first Barker factor, length of delay, triggers the process for determining whether a defendant's right to a speedy trial has been violated. If the delay is long enough to be considered "presumptively prejudicial," a review of the remaining three factors is required. Barker, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. This Court has held that a delay of over twelve months is "presumptively prejudicial." DeAngelis, 658 A.2d at 11 (quoting Powers, 643 A.2d at 831). Although more than five years passed between defendant's indictment in May 1988 and his trial on the instant charges in July 1993, most of that delay was attributable to defendant's voluntary and unlawful absence from this state. Accordingly, the trial justice found, with no objection from defendant, that "the new speedy trial clock began to run" in July 1992 when defendant was returned to Rhode Island. The trial on the assault-with-a-dangerous-weapon and leaving-the-scene-of-the-crime charges began on January 6, 1993, less than six months after defendant's return to the jurisdiction, and the instant trial commenced six months after that on July 6, 1993. Because the length of delay was less than twelve months and, therefore, not presumptively prejudicial, the trial justice was not required to consider the remaining three Barker factors before determining that defendant had not been denied his right to a speedy trial.

This Court notes that even if it were necessary to review the remaining _Barker_ factors, we would nevertheless conclude that defendant's right to a speedy trial had not been violated. First, to the extent that there was any delay in defendant's reaching trial on the instant charges, the primary reason for the delay was defendant's trial on other charges, time this Court has held "should not be weighed against the state when assessing the reasons for the delay." _State v. Austin_, 643 A.2d 798, 801 (R.I. 1994). Next, when assessing a defendant's assertion of his right to a speedy trial, this Court looks for actions sufficiently aggressive to constitute the equivalent of a "banging on the courthouse doors." _Powers_, 643 A.2d at 833 (quoting _Tate_, 110 R.I. at 656, 296 A.2d at 27). Using this standard, defendant's single request to counsel, in August 1992, for a speedy trial, following his extended unlawful absence from the state, is clearly insufficient to qualify as an assertion of his right. Finally, we are satisfied that a review of the record demonstrates the lack of any prejudice to defendant as a result of the delay between his return to Rhode Island and the commencement of trial. It reasonably follows, therefore, that because all the _Barker_ factors weigh considerably against defendant, the trial justice did not err in finding defendant had not been deprived of his right to a speedy trial.

_Bleau I_, 668 A.2d at 644-45.


## b. Analysis

It is apparent from the above excerpt that the Rhode Island Supreme Court correctly recognized that _Barker v. Wingo_ is the controlling Supreme Court precedent regarding speedy trial claims. _See id._ at 644. Given this recognition, the "contrary to ... clearly established federal law," 28 U.S.C. § 2254(d)(1), branch of the AEDPA is, at most, only marginally involved. _See Rashad_, 300 F.3d at 34-35 (holding this branch of AEDPA standard to be only marginally involved where "the state court correctly deduced that _Barker_ constituted the controlling Supreme Court precedent"). This leaves the "unreasonable application," 28

U.S.C. § 2254(d), clause.  See Rashad, 300 F.3d at 35.  Relief
from a state court judgment may also be granted if that judgment
is based on an unreasonable determination of the facts.  Id.
(citing 28 U.S.C. § 2254(d)(2)).  However, "the state court's
factual findings are entitled to a presumption of correctness
that can be rebutted only by clear and convincing evidence to the
contrary."  Id. (quoting Ouber, 293 F.3d at 27).  Unless the
petitioner can carry this heavy burden, a federal habeas court
must credit the state court's findings of fact, whether the
findings are made by a state appellate court or a state trial
court.  Id.

     With these principles in mind, the Court considers whether
the Rhode Island Supreme Court's denial of Bleau's speedy trial
claim is an "unreasonable application" of Barker or an
unreasonable determination of the facts.  In examining the first
Barker factor, the length of the delay, the state supreme court
noted that "[a]lthough more than five years passed between
defendant's indictment in May 1988 and his trial on the instant
charges in July 1993, most of that delay was attributable to
defendant's voluntary and unlawful absence from the state."
Bleau I, 668 A.2d at 645.  After citing the trial justice's
finding that the speedy trial clock had begun to run in July 1992
when Bleau was returned to Rhode Island, id., and the fact that
Bleau's trial had commenced on July 6, 1993, id., the court went
on to hold that "[b]ecause the length of delay was less than
twelve months, and, therefore, not presumptively prejudicial, the
trial justice was not required to consider the remaining three
Barker factors before determining that defendant had not been
denied his right to a speedy trial," id.

     The only arguable criticism which could be directed at this
portion of the state court's analysis is its suggestion that the
earliest point at which the speedy trial clock could have begun

to run was with Bleau's indictment in May of 1988.  The speedy
trial clock begins to tick when "a defendant is indicted,
arrested, or otherwise officially accused."  Rashad, 300 F.3d at
35 (quoting United States v. MacDonald, 456 U.S. 1, 6, 102 S.Ct.
1497 (1982)); see also id. at 36 ("a 'public accusation' animates
the right to a speedy trial")(quoting United States v. Marion,
404 U.S. 307, 321, 92 S.Ct. 455 (1971)).  Bleau was arrested on
January 19, 1988, and released on bail the following day.  Bleau
I, 668 A.2d at 644.  Thus, the earliest point at which the speedy
trial clock could have begun to run in Bleau's case is January
19, 1988, and not May 24, 1988, when the indictment was filed, as
the state supreme court appeared to suggest, see id. at 645
(stating that "more than five years passed between defendant's
indictment in May 1988 and his trial on the instant charges in
July 1993").  However, even if the state supreme court did not
recognize that the clock could have begun to run four months
earlier, this oversight is of no consequence because the court
found that the clock did not begin to run until July 1992 when
Bleau was returned to Rhode Island, see id., and this finding is
more than amply supported by the facts and accords with federal
law.  Moreover, under the AEDPA, this Court must determine
whether the state court's result, not its rationale, is
objectively reasonable.  Rashad, 300 F.3d at 36 n.5; cf. id. at
39 (describing four months as a "relatively short period of
delay" and holding that state court was not obliged to assign
responsibility for this delay where petitioner failed to contact
the authorities or inquire about the status of his case).

Defendant failed to appear for his scheduled arraignment on
the indictment on June 15, 1988, and a warrant for his arrest was
issued.  Bleau I, 668 A.2d at 644.  He was arrested on July 28,
1988, in Bangor, Maine, and returned to Rhode Island.  Id.  Bleau
was arraigned on the indictment on August 11, 1988, and released

on bail on August 22, 1988.  _Id._  Less than three months later, Bleau again failed to appear — not only for a status conference on the sexual assault case but also for trial on the assault-with-a dangerous-weapon and leaving-the-scene charges.  _Id._ Another warrant was issued for his arrest.  _Id._  Bleau, who had again left the state, was arrested and returned to Rhode Island in July of 1992.  _Id._  On July 15, 1992, he admitted to violating the conditions of his bail and was remanded to the Adult Correctional Institutions ("ACI").

It reasonably can be inferred that these facts caused the trial justice to find that "the new speedy trial clock began to run," _id._ at 645, in July 1992, _id._, and the state supreme court to uphold that finding, _id._  The finding is fully in accordance with federal law as "[a] defendant cannot complain of any delay attributable to his flight or unavailability."  _United States v. Bey_, 499 F.2d 194, 203-04 (1st Cir. 1974); _United States v. Cartano_, 420 F.2d 362, 364 (1st Cir. 1970)(same); _see also_ _Perron v. Perrin_, 742 F.2d 669, 677 (1st Cir. 1984)(holding that the final six-month delay was due to petitioner's absence "and as such cannot be weighed against the government").

Bleau argued at the hearing on the instant Motion that he kept the Public Defender's Office informed of his whereabouts and that his failures to appear were not his fault.  Thus, presumably, he contends that the speedy trial clock began with his arrest in January 1988, that it continued to run up to his trial in July 1993, and that this period of delay of almost five and a half years is presumptively prejudicial.  However, Bleau offers no evidence to support his claim that he kept the Public Defender's Office informed of his whereabouts.  Moreover, the state court found that Bleau's absence was both "voluntary and unlawful," _Bleau I_, 668 A.2d at 645, and Bleau offers no evidence to contradict these findings.  He admitted to violating his bail.

Id. at 644. Although Bleau now claims that his attorney told him
to make this admission and suggests that he had not violated the
conditions of his bail, Bleau again offers no evidence to support
these claims (especially his implicit claim that he had
permission to leave the state while released on bail) let alone
the required "clear and convincing evidence," Rashad, 300 F.3d at
35, under the AEDPA.

"In the habeas context, a petitioner who fails to adduce any
evidence regarding a segment of pretrial delay cannot rebut the
presumption of correctness to which the state court's finding
against him is entitled." Rashad, 300 F.3d at 38. Thus, Bleau
has not satisfied his burden with respect to the four year delay
which preceded July of 1992. Accordingly, this Court lacks any
basis for disturbing the state supreme court's implicit finding
that Bleau was a fugitive (or, at the very least, a bail
violator) during most of that period (and, thus, responsible for
almost all of the attendant delay). Cf. id. (reaching same
conclusion with respect to fifteen month period).

The state supreme court next found that the length of the
delay was less than twelve months, Bleau I, 668 A.2d at 645, and
that, therefore, it was not presumptively prejudicial and that
"the trial justice was not required to consider the remaining
three Barker factors before determining that defendant had not
been denied his right to a speedy trial," id. To the extent that
Bleau may contend that this determination constitutes an
unreasonable application of clearly established federal law, such
contention must be rejected because "neither Barker nor the
Constitution itself defines when a delay becomes presumptively
unreasonable," United States v. Green, 508 F.3d 195, 202 (5th Cir.
2007); see also Doggett v. United States, 505 U.S. 647, 652 n.1,
112 S.Ct. 2686 (1992)("'presumptive prejudice' does not
necessarily indicate a statistical probability of prejudice; it

simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker [i]nquiry").

Some federal courts have suggested that delays approaching twelve months are presumptively prejudicial. See Doggett, 505 U.S. at 654 n.1 ("Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year."); United States v. White, 443 F.3d 582, 589-90 (7th Cir. 2006)("As a general matter, courts have found delays approaching one year to be presumptively prejudicial."); United States v. Schreane, 331 F.3d 548, 553 (6th Cir. 2003)("A delay approaching one year is presumptively prejudicial."); see also Rashad, 300 F.3d at 33-34 ("The case law indicates that short periods of delay—say, appreciably less than one year—ordinarily are insufficient to justify further inquiry. Delays that exceed this floor generally require additional investigation.")(citations omitted). On the other hand, the Fifth Circuit has held that "[a] delay of less than one year will rarely qualify as 'presumptively prejudicial' for purposes of triggering the Barker inquiry," United States v. Jackson, 549 F.3d 963, 971 (5th Cir. 2008); see also Cowart v. Hargett, 16 F.3d 642, 646 (5th Cir. 1994)(same). Thus, the proposition that a delay of almost one year will always be sufficient to qualify as presumptively prejudicial is not accepted by all the federal courts of appeal. Cf. United States v. Perez-Perez, 337 F.3d 990, 995 (8th Cir. 2003)("A delay approaching one year may meet the threshold for presumptively prejudicial delay requiring a speedy trial inquiry."). In light of this lack of unanimity, it would be impossible for this Court to find that the Rhode Island Supreme Court's determination that a delay of less than twelve months is not "presumptively prejudicial," Bleau I, 668 A.2d at 645, is both incorrect and also objectively unreasonable, see Horton, 370

22

F.3d at 80.

Moreover, Bleau suffered no prejudice from this determination because the state supreme court went on to consider the other three _Barker_ factors.  See _Bleau I_, 668 A.2d at 645. The court found that the primary reason for the delay was Bleau's trial on the other charges and that this delay should not be weighed against the state.  _Id._  This finding comports with federal case law.  See _Young v. Haviland_, No. 3:05CV013, 2008 WL 563403, at *6 (S.D. Ohio Feb. 29, 2008)(finding no violation of federal speedy trial rights where reason for delay was "[p]etitioner was charged with two separate indictments"); _see also Ozsusamlar v. United States_, No. 09 Civ. 3501, 2010 WL 69106, at *5 (S.D.N.Y. Jan. 7, 2010)(noting that the Speedy Trial Act, 18 U.S.C. § 3161, "permits a Court to exclude time for a variety of reasons, including for delays resulting from trial on other charges against the defendant"); _cf. Schreane_, 331 F.3d at 555 (holding that "a pending state prosecution ... should be understood as a factor in the government's favor, to be weighted in considering the length of the delay, the prejudice to the accused, and the accused's assertion of right").

With respect to the next factor, whether Bleau asserted his right, the state court noted that it looked for "actions sufficiently aggressive to constitute the equivalent of a 'banging on the courthouse doors.'"  _Bleau I_, 668 A.2d at 645, and found that Bleau's "single request to counsel, in August 1992, for a speedy trial, following his extended absence from the state, is clearly insufficient to qualify as an assertion of his right," _id._  This finding is not an unreasonable application of clearly established federal law.  See _Prince v. Alabama_, 507 F.2d 693, 703 n.9 (5th Cir. 1975)(noting that a criminal defendant may assert his right to speedy trial by communications to either court or the prosecution); _see also Bey_, 499 F.2d at 204 (holding

that "a motion for speedy trial ... is not solely dispositive of
the issue" and, even where such motion is filed, it may not,
"without more, indicate ... a desire for a speedy trial");
Rashad, 300 F.3d at 45 ("The Supreme Court has warned against
assigning talismanic significance to a lone assertion of the
speedy trial right.")(citing Barker, 407 U.S. at 528-29); id. at
40 (concluding that "the petitioner failed to seek a speedy trial
with anything remotely approaching diligence"); cf. Goodrum v.
Quarterman, 547 F.3d 249, 259 (5th Cir. 2008)(noting "the ability
of courts to vary the weight assigned to a defendant's invocation
of the right depending on its frequency and forcefulness"); id.
at 260 (finding state court's failure to accord due weight to
petitioner's assertion of right "contrary to clearly-established
law" where petitioner for "2 ½ years[] doggedly invoked his speedy
trial right in numerous letters he sent to the District
Attorney's office").

As for the final factor, prejudice, the state court found no
"prejudice to defendant as a result of the delay between his
return to Rhode Island and the commencement of trial." Bleau I,
668 A.2d at 645. Bleau has not identified any prejudice, and
this Court sees none other than the fact that he was subjected to
pretrial imprisonment for less than twelve months,[16] a period too
short by itself to establish a constitutional level of prejudice.
United States v. Santiago-Becerril, 130 F.3d 11, 23 (1st Cir.
1997)(holding that "fifteen months of pretrial incarceration by
itself was insufficient to establish a constitutional level of

---

[16] It should be borne in mind that on January 8, 1993, Bleau was convicted of leaving the
scene of an accident involving personal injury and that he was sentenced for this offense on
March 17, 1993, to serve seven months of a two year sentence with seventeen months
suspended. See Bleau I, 668 A.2d at 644. Thus, of the slightly less than twelve months of
incarceration which Bleau experienced prior to his trial on the charges which are the subject of
the instant Amended Petition, seven of those months could reasonably be attributed to his
conviction for leaving the scene.

prejudice"); see also United States v. Serna-Villarreal, 352 F.3d 225, 231 n.3 (5th Cir. 2003)("The Sixth Amendment's Speedy Trial Clause is concerned with three types of prejudice: (1) 'oppressive pretrial incarceration,' (2) 'anxiety and concern for the accused,' and (3) 'the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence.'")(quoting Doggett, 505 U.S. at 654) (alteration in original).  While "Doggett establishes that, when the pretrial delay is grossly excessive, the fourth Barker factor can tilt in the defendant's favor even though no showing of actual prejudice has been made," Rashad, 300 F.3d at 41, the relevant period of delay at issue here is less than one year which cannot be considered "grossly excessive," id.; see also United States v. Robinson, 455 F.3d 602, 608 (6th Cir. 2006)("In the absence of particularized trial prejudice, delay attributable to the government's negligence 'has typically been shockingly long' to warrant a finding of prejudice.")(quoting Schreane, 331 F.3d at 559 (citing Doggett, 505 U.S. at 657, involving a six year delay)); cf. Schreane, 331 F.3d at 559 (holding that delay of thirteen and one-half months "attributable to the government's negligence" did not give rise to a presumption of prejudice).

In sum, I find that the Rhode Island Supreme Court's conclusion that Bleau's constitutional right to a speedy trial was not violated is not an unreasonable application of clearly established federal law and also that it is not based upon an unreasonable determination of the facts bearing on the issue. Accordingly, Bleau's first ground for relief should be rejected. I so recommend.

### 2.  Denial of Request for New Counsel

#### a.  Consideration by State Court

The portion of the state supreme court's opinion addressing this issue is set forth below:

On appeal defendant contended that the trial justice's denial of his request for the appointment of new counsel undermined his right to a fair trial by compelling him to proceed to trial with an attorney in whom he had no confidence. It is well settled that the decision whether to grant a defendant's request for a continuance to secure alternative counsel lies within the sound discretion of the trial justice. State v. Ashness, 461 A.2d 659, 663 (R.I. 1983). In exercising that discretion, the trial justice must weigh the interest of a criminal defendant in having counsel of his or her choice against the interest of the public in an efficient and effective criminal justice system. Id. at 664. In addition, the determination of "[w]hether the denial of a continuance is so arbitrary as to constitute a violation of due process depends upon the particular circumstances of each case and the reason asserted for the request." Id.

In Ashness the defendant was appointed private counsel six weeks prior to trial but waited until the day of trial to request a continuance to obtain alternative counsel. This Court affirmed the trial justice's denial of the request, reasoning that the defendant had had ample time to secure other counsel or to inform the court of his dissatisfaction with his present counsel. We concluded that by the time defendant finally made his request, his right to secure counsel of his own choice was outweighed by the necessity of the "efficient and effective administration of criminal justice." Ashness, 461 A.2d at 664.

In the instant case, defendant appeared in court on the first day of trial, represented by the same attorney who had represented him at trial six months earlier. Clearly, he had had ample opportunity in the period between his first and his second trial to seek new counsel and/or to express dissatisfaction with his present counsel. Nevertheless, defendant chose to wait until the second day of trial to inform the trial justice that he was dissatisfied with his representation. The trial justice, in denying defendant's request for new counsel, noted that the jury had already been impaneled, the complaining witness was waiting to testify, other witnesses were being brought in from the FBI laboratory, and defendant had already raised the speedy-trial issue. It is our opinion that at that point, defendant's interest in obtaining counsel more to his liking was

clearly outweighed by the public's interest in the efficient administration of the criminal justice system.

Moreover, the trial justice found that defendant had failed to present adequate grounds for the removal of counsel. Our careful review of the record has revealed that, although defendant contended that his ability to secure a fair trial was undermined because of his lack of confidence in his attorney, defendant made no explicit claim of ineffective assistance of counsel and, on appeal, actually conceded that trial counsel had not improperly represented him. On the basis of these facts, we conclude that the trial justice did not abuse his discretion in denying the request for a continuance to secure new counsel.

Bleau I, 668 A.2d at 645-46.

### b. Analysis

#### 1) Specific Facts

Bleau's case was reached for trial on the morning of Tuesday, July 6, 1993, see Trial Transcript ("TT") 7/6/93 at 1; see also TT 7/7/93 at 39, and the trial justice commenced hearing motions,[17] see TT 7/7/93 at 1. The hearing concluded the following morning, see id. at 38-39, and jury selection commenced, see id. at 39, 47. After the jury was impaneled, it was escorted from the courtroom. See id. at 48. At that time (during the afternoon session on July 7, 1993) Bleau complained to the trial justice about his attorney, Jack Barense ("Mr. Barense"), see id. at 52-54. Bleau claimed that he had asked Mr. Barense in August of 1993 "to put in for a speedy trial on these cases ...," id. at 52, and that Mr. Barense had told him that "there was no such thing as a speedy trial in the State of Rhode Island," id. Bleau also claimed that he had "talked to [Mr.

---

[17] The motions included Bleau's motion to suppress out of court photographic identification testimony and also in court identification, see Trial Transcript ("TT") 7/6/93 at 2, by the victim, see id. at 3, and the bartender, see id. at 17, and a motion to suppress evidence seized from Bleau's person, see id. at 36.

27

Barense] roughly 10, 15 minutes in one year's time, other than
going, the last trial I had and seeing him two minutes down in
the bull pen, we have not discussed this case." _Id._ at 53-54.
Bleau stated twice that he did not feel Mr. Barense was working
for his benefit. _Id._ at 54.

The trial judge asked Mr. Barense if he wanted to respond to
Bleau's claim that he was entitled to relief because he had not
been afforded a speedy trial. _Id._ Mr. Barense noted that Bleau
had two cases, _see id._, and that there was an interest in having
the other case "tried first because it was the weakest State
case, in my estimation," _id._ at 56. Mr. Barense also stated that
Bleau had been held as a bail violator, that Bleau wanted to have
bail set (which was mandatory if he was not tried within ninety
days of having his bail revoked, _see_ _Bridges v. Superior Court_,
396 A.2d 97, 102 (R.I. 1978)), and that ninety days had to run
before bail could be set, _See_ TT 7/7/93 at 55-56; _see also_ _State_
_v. DeLaurier_, 488 A.2d 688, 691 n.1 (R.I. 1985)(noting granting
of defendant's motion to set bail where ninety days had elapsed
between the time of his incarceration for bail violation and
trial on the charge upon which bail was revoked). Implicit in
Mr. Barense's remarks was that Bleau's primary objective had been
to have bail set rather than to be tried during the ninety days
and that filing a motion for speedy trial could have increased
the chances that Bleau would be tried in ninety days. _See_ TT
7/7/93 at 56.

The trial justice treated Bleau's comments as a _pro se_
motion to dismiss the indictment which he denied. _Id._ at 57-58.
With respect to Bleau's expression of dissatisfaction with his
counsel, the trial justice told Bleau that he would not continue
the trial for Bleau to get new counsel, _id._ at 61, and that Bleau
could either continue with Mr. Barense or represent himself, _id._
at 59. During subsequent colloquies separated by a recess, Bleau

stated multiple times that he did not want Mr. Barense as his
lawyer.  See id. at 58-59, 61, 65-66, 67, 70.  At one point he
asked the trial justice why the court could not appoint another
lawyer:

> THE DEFENDANT:  Why couldn't the Court appoint another
> lawyer?
>
> THE COURT:  See, that's why it would be advisable for
> you to have a lawyer, to answer questions
> like that.
>
> THE DEFENDANT:  Appoint a lawyer that's suitable to me,
> that will talk to me.
>
> THE COURT:  See?
>
> THE DEFENDANT:  Go over the details of the case with
> me.
>
> THE COURT:  You know, you have --
>
> THE DEFENDANT:  There is a difference.
>
> THE COURT:  You have a lot of questions, and you're
> finding no one to answer them.  Shouldn't
> that be sending you a signal you need a
> lawyer?
>
> THE DEFENDANT:  Definitely.  Definitely.  But it also
> sends me a signal that I don't need a
> lawyer that misrepresents me.
>
> THE COURT:  But --
>
> THE DEFENDANT:  And does not give me --
>
> THE COURT:  I am not --
>
> THE DEFENDANT:  -- the advice.

Id. at 68-69.

Immediately thereafter the trial justice stated that the
question of a continuance was addressed to his discretion and
that with the jury waiting to be sworn, a complaining witness

waiting to testify, and witnesses brought up from the FBI laboratory in Washington, see id. at 69, "there will be no continuance here to get other counsel," id. at 70.  The trial justice further stated that "[t]he motion to replace assigned counsel is denied," id., and that "[Bleau] understands that if he discharges Mr. Barense, no other appointment will be made by the Court," id. at 71.  After noting Bleau's disagreement with the ruling, the trial justice announced that the jury would be sworn "and everyone will have time to sleep on what's happened tonight, and we'll see you all tomorrow morning."  Id.

At the beginning of the court session on July 8, 2010, the trial justice told Bleau that it was "decision time," TT 7/8/93 at 51, and asked him whether he wanted to waive representation by counsel or whether he wanted to be represented by counsel, id. During a brief exchange, the trial justice indicated that Bleau had only "[o]ne choice," id., and stated that "[o]rdinarily, I would not let you waive counsel unless you wish to do that, and if you do that voluntarily," id.  He then asked Bleau: "What is it you wish to do?"  Id.  Bleau responded: "Well, I don't voluntarily do it."  Id.  The trial justice then ruled that Mr. Barense would continue with his appointment and that anything Bleau wished to say to the Court would be communicated through Mr. Barense.  Id. at 52.  The trial then proceeded.  Id.

## 2) Applicable Federal Law

The request for new counsel can best be analyzed as the denial of a continuance or the denial of a motion to substitute counsel.  United States v. Nickerson, 556 F.3d 1014, 1020 (9th Cir. 2009).  "The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel."  Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841

(1964). "There are no mechanical tests for deciding when a
denial of a continuance is so arbitrary as to violate due
process. The answer must be found in the circumstances present
in every case, particularly the reasons presented to the trial
judge at the time the request is denied." Id. Certain
principles which are applicable to cases in which a criminal
defendant asks that appointed counsel be replaced have been
identified by the First Circuit.

> Where the accused voices objections to appointed
> counsel, the trial court should inquire into the reasons
> for the dissatisfaction .... In evaluating whether a
> trial court's denial of motion for continuance
> constituted an abuse of discretion ... the appellate
> court should consider several factors, including the
> timeliness of the motion, the adequacy of the court's
> inquiry into the defendant's complaint, and whether the
> conflict between the defendant and his counsel was so
> great that it resulted in a total lack of communication
> preventing an adequate defense.

United States v. Prochilo, 187 F.3d 221, 225 (1st Cir. 1999)
(quoting United States v. Allen, 789 F.2d 90, 93 (1st Cir. 1986)).

The Rhode Island Supreme Court found that the trial justice
did not abuse his discretion in denying Bleau's request for a
continuance to secure new counsel. Bleau I, 668 A.2d at 646. In
reaching this conclusion, the state supreme court noted that
Bleau had "ample opportunity in the period between his first and
his second trial to seek new counsel and/or to express
dissatisfaction with his present counsel," id., and that he had
"chose[n] to wait until the second day of trial to inform the
trial justice that he was dissatisfied with his representation,"
id. At that point "the jury had already been impaneled, the
complaining witness was waiting to testify, other witnesses were
being brought in from the FBI laboratory, and [Bleau] had already
raised the speedy-trial issue." Id. As a result, the state
supreme court found that "defendant's interest in obtaining

counsel more to his liking was clearly outweighed by the public's interest in the efficient administration of the criminal justice system." Id.

The above analysis and conclusion fully comports with federal law. See United States v. Castro, 972 F.2d 1107, 1109 (9th Cir. 1992)("We have consistently held that a district court has broad discretion to deny a substitution motion made on the eve of trial, particularly where it would require the grant of a continuance."), overruled on other grounds by United States v. Recio, 537 U.S. 270, 123 S.Ct. 819 (2004); see also Nickerson, 556 F.3d at 1020 ("Generally, district judges have broad latitude to deny a motion for substitution of counsel on the eve of trial when the request would require a continuance."); United States v. Whitehead, 487 F.3d 1068, 1071 (8th Cir. 2007)("[T]he trial court has broad discretion to grant or deny a continuance for the purpose of retaining new counsel ... [and] that ... discretion is at its zenith when the issue is raised close to the trial date."); United States v. Jones, 482 F.3d 60, 75 (2nd Cir. 2006) (stating that denial of motion for new counsel is reviewed for abuse of discretion). Indeed, the First Circuit has warned specifically that "Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay." United States v. Van Anh, 523 F.3d 43, 49 (1st Cir. 2008)(quoting Allen, 789 F.2d at 93); see also United States v. Woodard, 291 F.3d 95, 108 (1st Cir. 2002)("We have consistently held that requests for substitution of counsel made on the day of trial are untimely."); accord United States v. Simmons, 582 F.3d 730, 735 (7th Cir. 2009)("The court was eminently reasonable in concluding that the motion was untimely, given that it was not made until the morning of trial and [defendant] had made no prior complaints about his counsel's performance."); Whitehead, 487 F.3d at 1071 (finding no abuse of

32

discretion where defendant "moved for a continuance to retain new counsel on the very morning of trial").

Moreover, requests for new counsel made earlier than Bleau's have been found to be untimely by federal courts.  See Van Anh, 523 F.3d at 49 (finding defendant's motion for new counsel filed six days before trial not timely); United States v. Reyes, 352 F.3d 511, 515 (1st Cir. 2003)(concluding defendant's motion untimely where filed a week before trial); see also Whitehead, 487 F.3d at 1071 ("morning of trial").  Bleau offers no argument that the denial of his request for a new attorney was contrary to Supreme Court precedent or that such denial constituted an unreasonable application of clearly established federal law as determined by the Supreme Court, and this Court fails to see any basis on which either finding could be made.  Accordingly, Bleau's second ground for relief should be denied.  I so recommend.

### 3.  Ineffective Assistance of Counsel
#### a.  Consideration by State Courts

In 1997 Bleau filed an application for post-conviction relief which included a claim that he had been denied effective assistance of counsel.  See Application for Post Conviction Relief (PM/97-4545) ("First Application").  The First Application asserted three grounds for relief: denial of speedy trial, denial of new counsel, and ineffective assistance of counsel.  See id., Att. (Facts to Support PCR Application) ("Facts to Support PCR") at 1.  This First Application was subsequently amended, apparently in 2001, to either add (or substitute) the ground of newly discovered evidence, namely the Robinson report concerning the trial testimony given by Agent Malone.  See Transcript of December 13 and 14, 2001, Hearing ("Tr. 12/13-14/01") at 4 (noting that the parties were before the court "on the amended

33

application based upon the report provided to the defense in 1999 by the Department of Attorney General which was filed in March of this year, 2001"). As already noted, <u>see</u> Travel Section II. A. <u>supra</u> at 4, the amended First Application was granted by a superior court justice on grounds of newly discovered evidence, <u>see</u> Tr. 12/13-14/01 at 36, 64, but the state supreme court reversed this judgment, <u>see</u> <u>Bleau II</u>, 808 A.2d at 644-45. As far as this Court can determine from the record, neither the superior court justice nor the state supreme court even ruled upon the three grounds for relief stated in the First Application as it was originally filed by Bleau, proceeding pro se, in 1997.

In June of 2004 Bleau filed a second application for post-conviction relief (PM/04-3441) ("Second Application"), alleging that he had been denied the right to a speedy trial, denied a fair trial because the trial justice refused to appoint a new attorney to represent him, and denied effective assistance of counsel. <u>Bleau III</u>, 968 A.2d at 278. A superior court justice denied the application in open court on March 24, 2005, finding that all of Bleau's complaints had been addressed by the Rhode Island Supreme Court in <u>Bleau I</u>, 668 A.2d 642. <u>See</u> Transcript of March 23, 2005, Hearing ("Tr. 3/24/05") at 12-13.

Bleau appealed, but the state supreme court affirmed the denial, <u>Bleau III</u>, 968 A.2d at 279, finding that the speedy trial claim and the denial of his request for new counsel were addressed in <u>Bleau I</u> and were barred by the doctrine of *res judicata*, <u>id.</u> at 278-79. With respect to the ineffective assistance of counsel claim, the court noted that Bleau alleged (1) an absence of pretrial investigation, (2) a failure to file a bill of particulars, and (3) a lack of pretrial preparation with him. <u>Id.</u> at 279. However, the court concluded that Bleau was judicially estopped from pursuing the ineffective assistance claim because "in his initial appeal the applicant 'actually

34

conceded that trial counsel had not improperly represented him.'"
Bleau III, 868 A.2d at 279 (quoting Bleau I, 668 A.2d at 646).

### b. Cognizable Claims

The State argues the only ineffective assistance of counsel
claim which this Court may consider is "the one he asserted in
his original (1997) post-conviction relief action, claiming that
he had '[n]o real communication with [his trial] attorney about
[the] case.'"[18]  Amended Motion to Dismiss at 5 (alterations in
original).  This is because, according to the State, the other
ineffective assistance of counsel claims, which were not raised
in the First Application, "may not be considered in any later
post-conviction relief application and, therefore, are
procedurally barred," id. (citing R.I. Gen. Laws § 10-9.1-8).[19]
However, R.I. Gen. Laws § 10-9.1-8 "contains a very limited and
narrow exception to this otherwise absolute bar; that exception
provides that issues which were 'finally adjudicated or not so

---

[18] In a footnote, the State notes that Bleau additionally asserted in his First Application
that his trial counsel was ineffective because he "refused to put in [a] motion to protect my rights
to speedy trial."  Amended Motion to Dismiss at 5 n.6 (quoting First Application, Att. (Facts to
Support PCR Application ("Facts to Support PCR")) at 1 (alteration in original).  However, as
the State correctly observes, since the substance of that speedy trial claim does not entitle Bleau
to federal habeas corpus relief, see Discussion Section IV. B. 1. supra at 16-24, his trial attorney
could not have rendered constitutionally deficient representation with respect to that claim.

[19] R.I. Gen. Laws § 10-9.1-8 states:

**Waiver of or failure to assert claims**. — All grounds for relief available to an
applicant at the time he or she commences a proceeding under this chapter must be
raised in his or her original, or a supplemental or amended, application.  Any ground
finally adjudicated or not so raised, or knowingly, voluntarily and intelligently
waived in the proceeding that resulted in the conviction or sentence or in any other
proceeding the applicant has taken to secure relief, may not be the basis for a
subsequent application, unless the court finds that in the interest of justice the
applicant should be permitted to assert such a ground for relief.

R.I. Gen. Laws § 10-9.1-8.

raised' may nonetheless be the basis for a subsequent application for postconviction relief if the court finds it to be 'in the interest of justice.'" Mattatall v. State, 947 A.2d 896, 905 (R.I. 2008)(quoting Ramirez v. State, 933 A.2d 1110, 1112 (R.I. 2007)).

The First Circuit has cautioned that "a federal court always must be chary about reaching a conclusion, based upon a speculative analysis of what a state court might do, that a particular claim is procedurally foreclosed." Pike v. Guarino, 492 F.3d 61, 74 (1st Cir. 2007). Such caution is warranted here for three reasons. First, unlike Bleau's fourth and fifth grounds for relief (judicial and prosecutorial misconduct), an argument can be made that Bleau is not attempting to raise a new ground for relief but simply explaining the basis for his previously asserted claim of ineffective assistance of counsel. This is especially true with respect to his contention that Mr. Barense was ineffective because of "a lack of pretrial preparation with [Bleau]." Bleau III, 968 A.2d at 279.

Second, it does not appear from the present record that the ineffective assistance of counsel claim contained in the First Application was actually litigated (beyond the bare assertion of the claim by Bleau). A primary purpose of the doctrine of *res judicata* is to bar the relitigation of matters already decided, see Rosa v. Oliveira, 424 A.2d 644, 645 (R.I. 1981)("[t]he doctrine of res judicata operates as a bar to relitigation of the same claim between the same parties"); see also DiBattista v. State, 808 A.2d 1081, 1086 (R.I. 2002)(stating that "*[r]es judicata* is a vehicle whose goal is the elimination of repetitive litigation"), and "§ 10-9.1-8 codifies the doctrine of *res judicata* for postconviction-relief applications," Ferrell v. Wall, 971 A.2d 615, 620 (R.I. 2009)(quoting Ramirez v. State, 933 A.2d 1110, 1112 (R.I. 2007)); see also id. at 620 n.2 (noting

that § 10-9.1-8 "is entitled 'Waiver of or failure to assert claims" and "that 'waiver' and 'res judicata' are closely related jurisprudential concepts"). Thus, allowing Bleau to include the ineffective assistance of counsel grounds stated in his Second Application would not result in duplicative litigation with respect to that claim.

Third, although the Rhode Island Supreme Court clearly could have stated that § 10-9.1-8 barred consideration of Bleau's ineffective assistance claim, it did not do so. See Bleau III, 968 A.2d at 279. Admittedly, the state supreme court found that Bleau was "judicially estopped from further pursing this issue," id., because he had conceded in his original direct appeal "that trial counsel had not improperly represented him," id., and such finding suggests that the court would not be inclined to find that it is "in the interest of justice," R.I. Gen. Laws § 10-9.1-8, to allow him to raise the ground in a second application. Nevertheless, given all the circumstances, this Court declines to assume that the Rhode Island Supreme Court would find that Bleau has procedurally defaulted the grounds for ineffective assistance of counsel identified in Bleau III, see id., 968 A.2d at 279.

Accordingly, this Court concludes that it may consider Bleau's claims of ineffective assistance counsel which Bleau raised in his original application and also in his Second Application. Specifically, these claims are (1) that Bleau had "[n]o real communication with [his] attorney about [the] case," Facts to Support PCR at 1; (2) that there was "a lack of pretrial preparation with [Bleau]," Bleau III, 968 A.2d at 279; (3) that the attorney failed "to file a bill of particulars," id.; and (4) that there was "an absence of pretrial investigation," id.

The State appears to recognize that the Rhode Island Supreme Court's holding that Bleau is "judicially estopped," id., from pursuing any ineffective assistance of counsel claims would not

qualify as a "consistently or regularly applied" state procedural
rule.[20]  See State's Mem. at 6 n.8 (quoting Gunter v. Maloney, 291
F.3d 74, 79 (1st Cir. 2002)("If the [Massachusetts Supreme
Judicial Court] did not regularly and consistently enforce this
procedural default rule, then it would not, for federal habeas
purposes, constitute an adequate and independent state ground.")
(citing Johnson v. Mississippi, 486 U.S. 578, 588-89, 108 S.Ct.
1981 (1989)(finding that when a state procedural rule has not
been "consistently or regularly applied" it cannot be "an
adequate and independent state ground for affirming petitioner's
conviction" on direct review in the Supreme Court))).  For the
sake of clarity, this Court so finds.  Accordingly, consideration
of the aforementioned grounds of ineffective assistance of
counsel is not precluded by the state supreme court's finding
that Bleau "is ... judicially estopped from further pursuing this
issue."  Bleau III, 968 A.2d at 279.

### c.  Law Re Ineffective Assistance of Counsel

> To establish that counsel's performance was
> deficient, a defendant must show that it fell below an
> objective standard of reasonableness under the
> circumstances. [Strickland v. Washington, 466 U.S. 668,]
> 687-88, 104 S.Ct. 2052 [(1984)].  This is a highly
> deferential review, making every effort to "eliminate the

---

[20] As noted by the State, the probable basis for the Rhode Island Supreme Court's
statement that Bleau in his initial appeal "actually conceded that trial counsel had not improperly
represented him," Bleau III, 968 A.2d at 279 (quoting Bleau I, 668 A.2d at 646), was "the
statement in Petitioner's Brief in Chief, at pp. 4-5, that '*It is not the contention of appellant
counsel that trial counsel did not properly represent the Defendant.  It is our contention that he
had long since lost the confidence of his client; and, as such, there was no opportunity for there
to be the type of interplay between client and counsel that is essential for properly safe-guarding
the rights of accused defendants,*'" State's Mem. at 6 n.8 (italics in original).  Assuming that the
State has correctly identified the basis for the state supreme court's finding that Bleau "conceded
that trial counsel had not improperly represented him," Bleau III, 968 A.2d at 279, this Court
understands why the State would choose not to rely on the state supreme court's finding of
judicial estoppel.  Fairly read, the statement was a concession by Bleau's appellate counsel—not
Bleau.

distorting effects of hindsight." Id. at 689, 104 S.Ct.
2052. As the Supreme Court emphasized in Yarborough v.
Gentry, the "Sixth Amendment guarantees reasonable
competence, not perfect advocacy judged with the benefit
of hindsight." 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d
1 (2003). When examining counsel's conduct, the court
considers the facts of the particular case from counsel's
perspective at the time. Strickland, 466 U.S. at 690,
104 S.Ct. 2052. Counsel has "wide latitude in deciding
how best to represent a client," Gentry, 540 U.S. at 5-6,
124 S.Ct. 1, and benefits from a strong presumption that
he or she rendered adequate assistance and exercised
reasonable professional judgment in making all
significant decisions. Strickland, 466 U.S. at 690, 104
S.Ct. 2052.

To establish prejudice, the defendant must show
that, but for counsel's unprofessional error, there is a
reasonable probability that the result of the proceeding
would have been different. See Wiggins v. Smith, 539
U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)
(finding prejudice where there was a "reasonable
probability that at least one juror would have struck a
different balance"); Strickland, 466 U.S. at 694, 104
S.Ct. 2052. A reasonable probability is a probability
sufficient to undermine confidence in the outcome.
Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

Sleeper v. Spencer, 510 F.3d 32, 38-39 (1st Cir. 2007).

An ineffective assistance of counsel claim requires both

deficient performance and resulting prejudice. Strickland v.

Washington, 466 U.S. at 687. The Court also "must evaluate the

challenged conduct from counsel's perspective at the time ...

making every effort to eliminate the distorting effects of

hindsight." Horton v. Allen, 370 F.3d at 86 (quoting Lema v.

United States, 987 F.2d 48, 51 (1st Cir. 1993))(alteration in

original). "[C]ounsel's performance is ineffective only if it

was objectively unreasonable under prevailing professional

norms." Id. at 81; see also Lynch v. Ficco, 438 F.3d 35, 49 (1st

Cir. 2006)("[T]he proper measure of attorney performance remains

simply reasonableness under prevailing professional norms.")

(alteration in original). Finally, the Court must "start with
the presumption that the challenged action was sound trial
strategy." Horton v. Allen, 370 F.3d at 86 (citing Phoenix v.
Matesanz, 233 F.3d 77, 82 (1st Cir. 2000)).

### d. Application

If a defendant is unable to show either "deficient
performance" or "sufficient prejudice," his claim of ineffective
assistance necessarily fails. Hooks v. Workman, 606 F.3d 715,
724 (10th Cir. 2010)(citing Strickland, 466 U.S. at 700 ("Failure
to make the required showing of either deficient performance or
sufficient prejudice defeats the ineffectiveness claim.")); see
also Strickland, 466 U.S. at 697 (noting that "a court need not
determine whether counsel's performance was deficient before
examining the prejudice suffered by the defendant as a result of
the alleged deficiencies."). "Thus, it is not always necessary
to address both Strickland prongs. In particular, if
[petitioner] is unable to satisfy his burden under Strickland's
prejudice prong it is unnecessary to determine whether counsel's
performance was deficient." Hooks, 606 F.3d at 724; see also
Janosky v. St. Amand, 594 F.3d 39, 45 (1st Cir. 2010)("Strickland
constructs a two-part algorithm for assessing claims of
ineffectiveness. Under this algorithm, a defendant must show
both that counsel's performance was deficient and that it
prejudiced his defense. An inquiring court need not necessarily
address both parts of this algorithm; if the court determines
that the defendant does not satisfy either part, it may stop
there.")(internal citation omitted); Blankenship v. United
States, 159 F.3d 336, 338 (8th Cir. 1998)("Turning first to the
prejudice prong of the familiar Strickland test, we recognize
that we need not address the competency of counsel's performance
if the prejudice issue is dispositive.").

That is the case here. This Court need not determine

whether the performance of Bleau's trial counsel was deficient because Bleau fails completely to show that he was prejudiced by his attorney's allegedly deficient performance. He provides no argument on this point in any of his written filings with this Court.

At the August 18, 2010, hearing, the Court, in an attempt to explore the prejudice prong, asked Bleau what another attorney could have done differently that would have altered the outcome of the trial. He responded that the attorney could have spoken to the witnesses and "even the victim." Recording of 8/18/10 Hearing. When asked what these witnesses would have said, Bleau answered:

> But the, they would have said what it was, it was, right, actually a consent. Right? She asked me to, this woman, asked me to take both of, take a guy home with her, to ride home with her, and she went around the block.

Id. According to Bleau, the victim then returned to the same spot, threw the other man out of the car, and, as Bleau went to step out of the vehicle, drove away with him "half out of the car." Id. Bleau asserted that the victim never mentioned the other man and that the witnesses could have "vouched for" the fact that she had left with two men, not just one. Id.

Bleau, however, is mistaken in his belief that the victim did not mention another man. She testified that "[Bleau] and Robbie" got into her car, TT 7/9/93 at 271, and that subsequently Robbie "seemed upset about something," id. at 272, and got out of the car, id. Thus, the fact that the victim voluntarily allowed Bleau and Robbie into her car was never in dispute. Also never in dispute was the fact that the victim drove away from the bar with Bleau inside her car and that she did so voluntarily, having agreed to give him a ride home. Id. at 273.

The critical issue was what happened thereafter between

them, and the only known witnesses to those events were Bleau and
the victim. She testified that after following Bleau's
directions they ended up near a house close to an industrial
park, see id. at 274-75; that she stopped the car, id. at 276,
that Bleau made a comment about the seat reclining, id., and that
suddenly both seats reclined, id. She testified further that
Bleau then pulled her into the back seat, started to hit her in
the face and head, and told her that "he was going to fuck [her]
whether [she] wanted it or not," id. at 277. The beating
continued as Bleau tried to rip her clothes off. Id. at 277.
She lapsed into unconsciousness, id. at 279, and when she
regained consciousness Bleau's finger was in her vagina, id. She
also testified that he put his penis in her vagina, id., and
stuck his finger in her rectum, id. at 280. Bleau's final words
to her, she recounted, were that "if I turned him in that he'd
come back and get me and my daughter and kill us both." Id. at
283. After Bleau departed, the victim attempted to move the car,
but the car would not move. Id. at 284. After getting out of
the car, she discovered that all the tires were flat. Id. at
285. She set off on foot, eventually meeting the police, and she
told them that she "had just been raped." Id. at 286.

Central Falls Police Officer Thomas Tinkham testified that
around 3:45 a.m., while responding to a call of a suspicious
vehicle, he encountered the victim walking. TT 7/8/93 at 133.
Tinkman testified that: "She was hollering, she was screaming,
obviously[] needing help." Id. The transcript continues:

Q     And what did you do?

A     I went to the woman immediately.

Q     And could you describe, could you describe her,
      when you saw that woman?

A     At that time the woman was crying, screaming, she

42

had obviously been beaten.  Her lip was cut.  I
remember her face was swollen.   Her clothes were
in total disarray.  Her jeans were cut, appeared
to be cut.  Her underwear, pants were hanging
out, torn, from the inside of the jeans.

Q    And what was she doing?

A    She was crying, sobbing that she needed help.
She had just been raped, please help her.

     ....

Q    And did you ever find out where this vehicle or
suspicious vehicle that was first called in was?

A    After I had stayed with the woman, I had called
the rescue from Lincoln to get there right away,
she was obviously hurt at that time, and I stayed
with her, asking her who did this to her.  She
told me that he was an elderly gentleman, and
then I recognized her from leaving the bar.[21]
I said, "Was he the same man you were with?"  She
said, "Yes."  I gave the description to the other
vehicles in the area that we were looking for an
elderly type man, balding, wearing a long brown
coat.

Id. at 134-135.

In denying Bleau's motion for a new trial, the trial justice recounted the above testimony by Officer Tinkham.  After doing so the trial justice stated:

     I refuse  to  accept  that  somewhere  between  the
     beating  of  her  face  and  head  and  the  slashing  of  her
     pants and underwear, the puncturing of her tires she was
     walking away from the automobile concocting a rape story.

---

[21] Officer Tinkham had testified that earlier that evening around 1:45 a.m., in the process of checking "to make sure that the various bars in downtown close[d] on time," TT 7/8/93 at 130, he encountered four or five men and a woman outside of Gerry's Café, id.  Tinkham told these persons that it was late and time to go home, see id.  He estimated the woman "to be in her early 20s, or so," id. at 131, and that "[t]here was an elderly gentleman, who was short, balding hair, with a long brown coat ...," id.

Transcript of September 10, 1993, Hearing ("Tr. of 9/10/93") at 498. This Court's assessment of the evidence matches that of the trial justice. The evidence of Bleau's guilt was substantial, if not overwhelming. <u>Cf.</u> <u>Janosky</u>, 594 F.3d at 45 ("[A] court must weigh the strength of the evidence in determining whether a sufficient showing of prejudice has been made under <u>Strickland.</u>"). In short, Bleau has failed to demonstrate that there is a reasonable probability the jury would have rendered a different verdict if the alleged deficiencies in the performance of his trial attorney had not occurred. Accordingly, Bleau's third claim for relief should be rejected. I so recommend.

### 4. Judicial and Prosecutorial Misconduct

#### a. Grounds

Bleau's remaining grounds for relief are alleged judicial misconduct and prosecutorial misconduct. Amended Petition at 11-12. The judicial misconduct allegedly is: (1) that the trial justice did not order a mistrial when he was told that a jury member had seen Bleau in handcuffs while in the hallway,[22] <u>id.</u> at 11; (2) that the trial justice did not order a mistrial when a state witness said that he had received Bleau's photograph from the North Attleboro Police Department, <u>id.</u>; and (3) that the trial justice did not order a mistrial when he had to call Mr. Barense's name three times in open court and then ask him "if he

---

[22] The trial transcript does not reflect an incident like this, although such an incident did occur during Bleau's earlier trial on the charge of leaving the scene of an accident. <u>See</u> <u>State v. Bleau</u>, 649 A.2d 215, 219 (R.I. 1994). Bleau may be confusing the two trials.

wanted to object [to the] previously mentioned photo,"[23] id.  The
claimed prosecutorial misconduct is that the attorney(s) for the
state allegedly made false and misleading statements to the court
during the post-conviction hearing on January 3 and 4, 2002, and
also during a December 7, 2009, hearing on Bleau's motion to
reduce sentence.  See id. at 11-2.

### b.  Procedural Default

It is unnecessary for the Court to address the specifics of
either claim because Bleau has procedurally defaulted both claims
by failing to raise them in either his direct appeal or his two
subsequent applications for post-conviction relief.  See Pike,
492 F.3d at 73 ("[A] claim is procedurally defaulted if it was
not presented to the state courts and it is clear that those
courts would have held the claim procedurally barred.").  Bleau
admits that he did not raise these claims in state court.  See
Amended Petition at 11 (explaining that he did not raise the
claim of judicial misconduct in state court because it
constitutes "New Grounds"); id. at 11-2 (explaining that he did
not raise the claim of prosecutorial misconduct in state court
because the "Superior Court told [him] that no more Post-
Conviction Motions would be heard ...").  It is also clear that
the state courts would hold that Bleau is procedurally barred
from raising them now.  See Ferrell v. Wall, 971 A.2d at 621
("The applicant could have and indeed should have raised this
issue in his first application for post-conviction relief.  His
failure to raise this allegation at that time results in a bar to
the litigation of that issue and that claim for relief."); Taylor

---

[23] Similarly, the trial transcript also does not reflect this alleged lapse by Mr. Barense.
See TT 7/9/93 at 219-20.  To the contrary, the record indicates that after Lieutenant Joseph
Almond of the Lincoln Police Department testified on direct examination that he had obtained a
photograph of Bleau from the North Attleboro Police, id. at 219, Mr. Barense moved for a
mistrial without any prompting by the trial justice, id. at 221.

<u>v. Wall</u>, 821 A.2d 685, 688 (R.I. 2003)(holding that §10-9.1-8 "codifies the doctrine of *res judicata* as applied to petitions for post-conviction relief" and that "*[r]es judicata* bars the relitigation of any issue that could have been litigated in a prior proceeding, including a direct appeal, that resulted in a final judgment between the same parties, or those in privity with them"); <u>State v. DeCiantis</u>, 813 A.2d 986, 992-93 (R.I. 2003) (explaining that once a defendant litigates a post-conviction relief application to judgment any ground not raised in that application "may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground for relief"); <u>see also</u> <u>Cristin v. Brennan</u>, 281 F.3d 404, 410 (3rd Cir. 2002)(explaining that "federal courts must 'ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts'")(quoting <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 848, 119 S.Ct. 1728 (1999)); <u>id.</u> ("The 'fairly presented' requirement has long been a component of the exhaustion doctrine[24] and requires that the prisoner present his federal habeas claims **at all levels of state court adjudication.**")(citing <u>Picard v. Connor</u>, 404 U.S. 270, 275-76, 92 S.Ct. 509 (1971))(bold added); <u>id.</u> ("The failure to 'fairly present' federal claims in state court bars the consideration of those claims in federal court by means of habeas corpus because they have been procedurally defaulted.").

Where "a state prisoner has defaulted his federal claims in

_____

[24] Under the exhaustion doctrine, a federal court may not grant habeas relief to a state prisoner unless he first exhausts his remedies in state court. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 843, 119 S.Ct. 1728 (1999). "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." <u>Id.</u>

state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546 (1991); Walker v. Russo, 506 F.3d 19, 22 (1st Cir. 2007)("a habeas petitioner's state procedural default can be excused if petitioner can show both cause for and prejudice resulting from the default")(citing Wainwright v. Sykes, 433 U.S. 72, 84-85, 87, 97 S.Ct. 2497 (1977)); see also McCambridge v. Hall, 303 F.3d at 34 ("[I]f the state decision rests on the adequate and independent state ground of procedural default, then federal habeas review is unavailable absent a showing of cause and prejudice, or a showing that a miscarriage of justice will otherwise result.").

Bleau offers no real argument regarding his failure to raise these claims in state court. In some of his filings he appears to criticize one or more of the attorneys who represented him in post-conviction relief proceedings. To the extent that Bleau may contend that his failure to raise these claims in state court was due to the ineffectiveness of his post-conviction relief counsel, such contention is rejected for the following reasons.

First, there is no constitutional right to counsel in state post-conviction proceedings. See Pennsylvania v. Finley, 481 U.S. 551, 557, 107 S.Ct. 1990 (1987)(holding that there is no right to counsel in state post-conviction proceedings after exhaustion of direct appellate review). Accordingly, Bleau's failure to raise these claims cannot be excused on the basis that his post-conviction relief counsel were ineffective when Petitioner had no constitutional right to appointed counsel in those proceedings in the first place.

Second, "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). Since Bleau is barred from asserting ineffectiveness of counsel in state post-conviction relief proceedings as an independent ground for federal habeas relief, it would be illogical for the Court to accept the same ineffectiveness of counsel as a "cause" of procedural default. The Court declines to do so.

Third, Bleau cannot blame his post-conviction relief counsel for omitting the claim of judicial misconduct from his original application for post-conviction relief which Bleau filed *pro se* in 1997. All of the grounds allegedly constituting the judicial misconduct were known to Bleau at that time, yet he failed to include them in the First Application.[25]  Thus, as this information was known to Petitioner at the time of the post-conviction relief proceedings, he could have raised these issues at that time.

Accordingly, I find that Bleau has not shown cause for his failure to raise these grounds in the state post-conviction proceedings.  See Cristen v. Brennan, 281 F.3d at 412 ("To show cause and prejudice, 'a petitioner must demonstrate some objective factor external to the defense that prevented compliance with the state's procedural requirements.'")(quoting

_____

[25] The grounds allegedly constituting the prosecutorial misconduct concern events occurring in 2002 and 2009 and, thus, could not have been raised by Bleau in 1997.  However, Bleau is complaining of conduct occurring in connection with post-conviction proceedings. Thus, his attack is directed towards proceedings collateral to his detention and not the detention itself.  Such attack is not cognizable in federal habeas corpus.  See Milliard v. Lynaugh, 810 F.2d 1403, 1410 (5th Cir. 1987)(denying habeas corpus relief "because the complaint is an attack on a proceeding collateral to the detention and not the detention itself"); King v. Dretke, No. 1:01CV435, 2006 WL 887488, at *11 (E.D. Tex. Mar. 29, 2006)("Complaints as to the adequacy of state post-conviction proceedings ... are not cognizable in federal *habeas corpus*.").

<u>Coleman v. Thompson</u>, 501 U.S. at 753, 111 S.Ct. 2546).

I also find that Petitioner has not shown actual prejudice as a result of the alleged judicial misconduct and prosecutorial misconduct. As already noted,[26] two of the instances of alleged judicial misconduct lack any factual support in the record, and the remaining instance, the denial of a motion for a mistrial could not constitute judicial misconduct, <u>see Lisa v. Fournier Marine Corp.</u>, 866 F.2d 530, 532 (1st Cir. 1989)("a charge of judicial misconduct 'is never supported by mere reference to adverse rulings and findings'")(quoting <u>Joseph E. Bennett Co. v. Trio Indus.</u>, 306 F.2d 546, 549 (1st Cir. 1962)). The alleged acts of prosecutorial misconduct occurred more than eights years after Bleau's trial. Thus, the acts could not have prejudiced Bleau at the trial.[27]

As Bleau has not shown cause for his default and actual prejudice as a result of the alleged judicial and prosecutorial misconduct, the Court next considers whether he has demonstrated that the failure to consider these two claims will result in a fundamental miscarriage of justice.[28] See <u>Coleman v. Thompson</u>, 501 U.S. at 750, 111 S.Ct. 2546; <u>Janosky</u>, 594 F.3d at 46 ("[E]ven without a finding of cause and prejudice in the conventional sense, a federal habeas court may excuse a procedural default if the petitioner can demonstrate that a failure to consider his claim will work a fundamental miscarriage of justice. The

---

[26] <u>See</u> n.22, n.23.

[27] <u>See</u> n.25.

[28] For federal habeas purposes, the "'fundamental miscarriage of justice' standard means that petitioner must establish actual innocence." <u>Simpson v. Matesanz</u>, 175 F.3d 200, 210 (1st Cir. 1999). In order to establish actual innocence, a "petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." <u>Id.</u> (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 321, 115 S.Ct. 851 (1995)).

miscarriage-of-justice exception is narrow and applies only in extraordinary circumstances—circumstances in which a petitioner makes some showing of actual innocence.")(internal citation omitted).  Bleau has made no such showing.  <u>See</u> Discussion Section IV. A. 3. d. <u>supra</u> at 43 (finding that the evidence of his "guilt was substantial, if not overwhelming").  Accordingly, this Court may not consider his claims for relief based on prosecutorial and judicial misconduct.

## V.  Summary

The Rhode Island Supreme Court's adjudication of Bleau's claims based on (1) speedy trial, (2) the denial of a continuance for the appointment of new counsel, and (3) ineffective assistance of counsel (to the extent that this claim was considered by that court) is not contrary to, nor does it involve an unreasonable application of, clearly established federal law as established by the United States Supreme Court.  To the extent Bleau's claims of ineffective assistance of counsel were not adjudicated by the Rhode Island Supreme Court, such claims fail because he has not demonstrated that he was prejudiced by alleged deficient performance of his trial counsel.  Consideration of Bleau's claims based on alleged judicial misconduct and prosecutorial misconduct is barred because he has procedurally defaulted those claims by not raising them in the state court, and he has not demonstrated cause and prejudice to excuse such failure, nor has he demonstrated that the failure to consider these claims will result in a fundamental miscarriage of justice.  Accordingly, Bleau's Amended Petition should be denied, and the State's Amended Motion to Dismiss should be granted.  I so recommend.

## VI.  Conclusion

For the reasons explained above, I recommend that the State's Amended Motion to Dismiss be granted and that the Amended

Petition be dismissed with prejudice.  Any objection to this
Report and Recommendation must be specific and must be filed with
the Clerk of the Court within fourteen (14) days of its receipt.
See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file
specific objections in a timely manner constitutes waiver of the
right to review by the district court and the right to appeal the
district court's decision.  See United States v. Valencia-Copete,
792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor
Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
November 12, 2010